IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| C.R.H. INDUSTRIAL WATER, LLC, *et al.*, | ) ) ) | CASE NO. 1:23-CV-1805 |
| Plaintiffs, | ) ) | MAGISTRATE JUDGE JENNIFER DOWDELL ARMSTRONG |
| v. | ) ) | |
| MICHAEL EIERMANN, *et al.*, | ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) | |

**I.     INTRODUCTION**

This trade secrets case was dismissed with prejudice in March 2025 pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure after a lengthy mediation process. (Order, ECF No. 62.) It is now before the Court because the plaintiffs allege that the defendants breached the settlement agreement that ended their litigation. (Notice, ECF No. 63.)

Plaintiffs C.R.H. Industrial Water, LLC and C.R.H. Ohio, LTD. ("Plaintiffs") request the entry of a consent judgment against Defendants Michael Eiermann, Andrew Bokovitz, Perry Celaschi, and Engineered H2O Solutions, LLC ("Defendants")—the remedy provided in their settlement agreement for a breach. (*Id.*; *see also* Consent Judgment, ECF No. 63-1.) The parties had agreed that the Court would retain jurisdiction over the terms of their settlement agreement (*see* Stipulated Notice, ECF No. 61), and further specifically agreed that I would retain jurisdiction to interpret and enforce the terms of the settlement agreement if any dispute arose. (*See* Minutes of Proceedings [non-document], Jan. 27, 2025.)

For the reasons that follow, and after holding a hearing and considering all the evidence relevant to the alleged breach, I find that Defendants materially breached the settlement agreement, and I authorize the filing of the consent judgment.

1

Plaintiffs may file an appropriately supported brief setting forth their reasonable attorney fees, as provided under the consent judgment, on or before **December 24, 2025**. Defendants may file an appropriately supported response, setting forth their position on the reasonableness of the sought fees, two weeks after Plaintiffs' brief. Plaintiffs may file a reply brief one week after Defendants' responsive filing. The Court will then determine whether a hearing is necessary on the amount of fees (if any) to be awarded, conduct any additional necessary proceedings, and then enter the final consent judgment.

## II. PROCEDURAL HISTORY

Plaintiffs filed their complaint against Defendants on September 15, 2023. (Compl., ECF No. 1.) Plaintiffs alleged that the Defendants misappropriated proprietary and confidential information to unfairly compete with them. (*See generally* Compl., ECF No. 1.)

Essentially, Plaintiffs alleged that Mr. Eiermann founded Western Reserve in 2003, and the business specialized in delivering water treatment products and technologies to customers in the medical, food, and pharmaceutical industries. (*Id.* at ¶ 20.) After nearly 16 years in business, Western Reserve filed for bankruptcy in April 2019. (*Id.* at ¶ 18.) C.R.H. Industrial Water purchased the assets of Western Reserve in bankruptcy in December 2020. (*Id.* at ¶¶ 9, 19.) Western Reserve then continued to operate. (*Id.* at ¶ 19.) As part of the transition to new ownership, Western Reserve rehired certain employees from the previous iteration of the company, including Mr. Eiermann. (*Id.*)

Mr. Eiermann quit in June 2021 after Western Reserve confronted him about his intention to start a new water treatment business that would compete with Western Reserve. (*Id.* at ¶ 50.) After Mr. Eiermann quit, he sued Western Reserve alleging nonpayment of wages. (*Id.* at ¶ 36.) Western Reserve and Mr. Eiermann have been embroiled in litigation ever since.

In December 2022, the parties settled Mr. Eiermann's initial suit and entered a Release and Settlement Agreement. (*Id.* at ¶ 37.) Western Reserve paid Mr. Eiermann a sum of money to resolve the claims and in exchange for non-disparagement and a promise that Mr. Eiermann would not divulge trade secrets. (*Id.*)

Here, the plaintiffs alleged that Mr. Eiermann and his new companies hired Western Reserve's employees, solicited its clients, and used its trade secrets. (*Id.* at ¶¶ 58, 60, 76.) The Court dismissed several of the plaintiff's claims in November 2024. (Order, ECF No. 53.) The parties entered focused settlement negotiations at least as early as December 2024. I held mediation conferences with the parties on December 17, 2024; December 23, 2024; January 6, 2025; January 23, 2025; and January 27, 2025. The docket reflects that the parties made progress toward settling the dispute at each successive meeting.

The docket reflects that these mediated negotiations culminated in an agreement "on all material terms of the settlement agreement" on January 27, 2025. (Minutes of Proceedings [non-document], Jan. 27, 2025.) The parties further agreed and consented to my jurisdiction to interpret and enforce the terms of the parties' settlement agreement if any dispute were to arise. (*Id.*) Finally, the parties agreed to file a joint stipulated notice of dismissal within 30 days of that conference (*id.*), but no such notice was timely filed.

I held a status conference with the parties on March 6, 2025. (Minutes of Proceedings [non-document], Mar. 6, 2025.) The docket reflects that, at this conference:

> After extensive discussion with the parties and verbal authorization from Defendant Michael Eiermann, agreement was reached that Michael Eirmann shall sign the settlement agreement on behalf of himself and the Defendant corporate entities today, and the signed agreement shall be electronically transmitted to Plaintiff's counsel today. Defendants Andrew Bokovitz and Perry Celaschi shall also sign the settlement agreement, and it will be electronically transmitted to Plaintiff's counsel on or before 3/12/2025.

3

(*Id.*)

The settlement agreement was then signed, as agreed, and the parties entered their stipulated notice of dismissal on March 19, 2025. (Notice, ECF No. 61.) The Court dismissed the action with prejudice pursuant to the parties' agreement on March 24, 2025. (Dismissal, ECF No. 62.)

On June 12, 2025, Plaintiffs filed a notice of filing the consent judgment, alleging that the defendants had violated the settlement agreement by: (1) failing to maintain a communication log and confer with Plaintiffs' counsel twice per month; and (2) soliciting Plaintiffs' customers or providing false information regarding their communications with those customers. (Notice, ECF No. 63.) Plaintiffs claim that Mr. Eiermann and his corporate entities solicited two of the plaintiffs' clients after the settlement agreement was reached in January 2025: while each maintains several operating locations, the parties have referred to these clients as "Intigral" and "MCCO." (*Id.*)

Defendants filed a brief in opposition to the filing of the consent judgment, arguing that no material violation of the agreement occurred and that the agreement was not effective until March 2025 (when the last signatures were added to the agreement). (Br. Opp'n, ECF No. 66.)

I held an evidentiary hearing on October 27, 2025, at which Mr. Eiermann and two employees of Western Reserve testified.

This Memorandum Opinion and Order follows.

**III.    ANALYSIS**

An alleged breach of a settlement agreement is generally evaluated under the same standards as a breach of contract. *E.g.*, *Integrated Design Eng'g and Analysis Servs., Inc. v. Giddy Holdings, Inc.*, No. 5:20-cv-00563, 2021 WL 848949, at *3 (N.D. Ohio Mar. 5, 2021) (evaluating a party's claim for breach of the parties' settlement agreement as the same as breach of contract) (citing *Carbone v. Nueva Constr. Crp., L.L.C.*, 83 N.E.3d 375, 280 (Ohio Ct. App. 2017)). A party

does not breach a contract when it substantially performs the terms of the contract. *Whitt Sturtevant, LLP v. NC Plaza LLC*, 43 N.E.3d 19, 30 (Ohio Ct. App. 2015). For a breach to be material, the failure must "defeat[] the essential purpose of the contract or make[] it impossible for the other party to perform." *Id.*

Here, the defendants agreed to certain solicitation restrictions as part of the settlement in this case. Specifically, the settlement agreement provides as follows, in relevant part:

> Defendants . . . agree not to solicit . . . any customers for whom Plaintiffs have serviced . . . in the last twelve (12) months of fully executing this Agreement.
>
> For purposes of this agreement, solicit is defined as the initiation of any communications with any of Plaintiffs' customers with the purpose to sell or offer to sell any materials, parts, or services or otherwise establish a business relationship with Defendants.
>
> To ensure compliance with this Agreement, Defendants shall maintain a communication log, identifying the company and individuals who initiated any contact.
>
> For purposes of this Agreement, communication shall include any oral, written or electronic . . ., telephonic, or other contact with a current or prospective customer.
>
> Defendants' counsel will confer with Plaintiffs' counsel twice per month for the time period of this Agreement to review the communications log to ensure that Defendants are complying with this Agreement. During this conference, Defendants will disclose the source or identity of the individuals or parties of any communication logged during the relevant period.
>
> Plaintiffs' counsel will confirm or deny the existence of a business relationship between Plaintiffs and the contacting individual or entity with Defense counsel.
>
> Plaintiffs and Defendants agree that any information exchanged in these bimonthly conferences shall be deemed "Attorneys' Eyes Only" and not shared with the clients.
>
> Defendants shall immediately notify their counsel if they are contacted by any of Plaintiffs' customers in the period proscribed in this agreement, as well as the nature of the inquiry. . . .
>
> Defendants agree that any violation of this paragraph is grounds for a finding of noncompliance with this Agreement and that Plaintiffs may immediately file the Consent Judgment . . .

(Settlement Agreement, Ex. 7) (line breaks added for readability).

Plaintiffs allege that Defendants breached this provision in three ways: (1) by soliciting Intigral and MCCO, causing Intigral to switch its ongoing business from Western Reserve to Mr. Eiermann's new businesses and causing MCCO to reject Western Reserve's bid on a single project in favor of a bid tendered by Mr. Eiermann's new businesses; (2) by failing to confer twice per month to review the communications log; and (3) by failing to adequately maintain the communication log and communicate contacts with the plaintiffs' customers to their counsel.

Defendants do not dispute that their counsel did not meet twice per month with the plaintiffs' counsel to review the communication log. However, Defendants argue that this breach was not material both because the absences were reasonable (counsel was dealing with a pressing family matter out of state) and because there were no applicable communications to report.

After careful consideration, the Court finds that Defendants breached the terms of the settlement agreement by failing to confer twice per month as required. That said, the Court need not decide whether the breach was material to resolve this dispute. This is so because the Court finds by a preponderance of the evidence that the defendants materially breached the non-solicitation provision in other ways. Specifically, Mr. Eiermann, Engineered H2O Solutions, LLC, and M&M Water Processing Inc. failed to adequately maintain a communication log and communicate contacts with the plaintiffs' customers to their counsel as required under their agreement.

Before explaining this conclusion, I will briefly discuss the dispute between the parties regarding the effective date of the agreement. Defendants claim that they were not bound by the terms of the non-solicitation provision until March 2025, when the last signature was inked on the settlement agreement. Plaintiffs, in contrast, argue that the agreement's provisions extend back to January 2025 when the parties agreed on all the material terms. The plaintiffs allege that Mr.

6

Eiermann intentionally delayed signing the contract after it was drafted, in order to surreptitiously continue negotiations with Intigral and MCCO.

It is true that the parties had agreed on all the material terms of the settlement agreement by January 27, 2025. (Minutes of Proceedings [non-document], Jan. 27, 2025.) It is also true that the details of the non-solicitation provision were material and agreed upon by that date; without getting into the details of negotiations, I note that the parties agree that the provision had been heavily negotiated. However, the terms of the provision, as ultimately drafted, refer to "customers for whom Plaintiffs have serviced . . . in the last twelve (12) months of **fully executing** this Agreement." (Settlement Agreement, Ex. 7) (emphasis added). Defendants point out that if the non-solicitation provision dates back to January 2025, the reporting period should end in January 2026, a result that would seem to be absurd considering the other terms in the contract.

The settlement agreement is ambiguous, but in the narrow context of resolving this dispute I need not decide whether the non-solicitation provision was binding on the defendants as of January 2025. This is so because I find that the preponderance of the evidence supports that the Defendants breached the settlement agreement even if the non-solicitation obligations attached in March 2025, a point that I explain further below.

I turn next to the parties' dispute about the communications that must be logged and reported to counsel. The resolution of this disagreement, ultimately, decides this matter. Defendants argue that they were not required to record *every* communication with a potential customer, but only the initial communication wherein a potential business relationship was discussed. The argument relies partly on the definition of "solicit" in the agreement—which was limited to "the initiation of any communications with any of Plaintiffs' customers with the purpose to . . . establish a

7

business relationship with Defendants." And it relies partly on what was required to be included in the log, namely an identification of "the company and individuals who initiated any contact."

Read together, the argument goes, Defendants were only required to log initial communications in and after March 2025. If a company reached out to Defendants about potential business in December 2024, for instance, Defendants need not continue to identify communications with that company in its log even if negotiations and business discussions continued throughout 2025.

This is an overly narrow and patently unreasonable reading of the non-solicitation provision. While "solicit" is defined narrowly, the parties negotiated and agreed upon an expansive definition of "communication." The latter term includes "any oral, written or electronic . . ., telephonic, or other contact **with a current** or **prospective** customer." (Settlement Agreement, Ex. 7) (emphasis added).

Defendants' narrow reading of "communication" simply does not make sense considering that the definition encompasses contacts with the defendants' current customers. Moreover, a broader reading of the term is logical. The log and bimonthly check-ins were meant to allow Plaintiffs to "ensure compliance with this Agreement" in an atmosphere of distrust, and the contents of the log were not onerous—Defendants needed only record the company involved in the communication and the individual who initiated contact with that company.

The maintenance of a complete and accurate communication log was a material term in the contract, like the other provisions of the non-solicitation provision.

Beyond logging communications, the contract also required Defendants to "notify their counsel if they are contacted by any of Plaintiffs' customers . . . as well as the nature of the inquiry." It was equally unreasonable for Defendants to interpret this requirement narrowly. This term also

8

went directly to Plaintiff's ability to ensure Defendants' compliance with the agreement, and there is no limitation to "initial contacts" here.

Therefore, the Court finds that Defendants breached the settlement agreement if, after the contract was fully executed in March 2025, they failed to maintain the broad communication log required under the contract or to disclose to counsel contacts with Plaintiff's customers. This brings the Court, at last, to the evidence presented at the evidentiary hearing.

A preponderance of the evidence supports the conclusion that Defendants breached the settlement agreement.

Mr. Eiermann testified that his companies have *tried* to maintain a call log since March 2025, "[a]s best we can." But he could not confirm that every call received by the company was entered on the log, as required. His testimony makes clear that not every call was recorded.

First, Mr. Eiermann could say only that "we're very busy and we try our best." Defendants never produced their log. Mr. Eiermann could not remember the last time that he accessed the log.

More concerning, though, Mr. Eiermann testified that—despite the settlement agreement's language— he interpreted the agreement to impose no obligation to track every communication with current or prospective customers. He testified that he believed he only had to log "the initiation of contact."

The harm of Mr. Eiermann's overly narrow interpretation of the log requirement is not speculative. He testified that after he executed the contract, he engaged in cold-calling prospective customers. While he testified that none of those prospective customers were Western Reserve customers, under his understanding of the contract these communications would not have been logged for Plaintiffs to ensure his compliance with the agreement.

9

Moreover, Mr. Eiermann testified that his companies communicated with MCCO—which had been a Western Reserve customer—regarding a re-bedding project in summer 2025 (after the settlement agreement was executed). He testified that his companies sent a proposal to another customer, Intigral, on March 12, 2025, after he signed the agreement. He said that he would have had one or two communications with Intigral after that date. Intigral entered into business with Mr. Eiermann's companies sometime after the settlement agreement was fully signed.

None of these post-execution communications would have been included on a communication log or shared with Plaintiffs under Defendants' overly narrow interpretation of the communication log requirement. That, frankly, vitiates the mechanism by which Plaintiffs could ensure compliance with this agreement.

Defendants' failure to maintain a complete communication log in and after March 2025 constitutes a material breach of the non-solicitation paragraph in the settlement agreement.

Because Defendants violated the settlement agreement after it was fully signed, I need not consider whether Defendant's failure to meet bimonthly was also a material breach. I further do not need to consider whether the non-solicitation obligations extended back to January 2025, such that there may be further material breaches of the agreement. Finally, I note that I need not consider whether Defendants actually solicited Western Reserve's clients in violation of the agreement. This is so because the contract provides that "**any** violation" of the non-solicitation provision "is grounds for a finding of non-compliance" allowing the filing of the consent judgment.

I nevertheless make several observations, before concluding, regarding Mr. Eiermann's testimony (which I had the opportunity to observe).

10

First, Mr. Eiermann testified that between January and March 2025, he was contacted by one of Western Reserve's customers regarding potential business. This contact was not logged, and Mr. Eiermann could not remember the name of the customer during his testimony.

Second, Mr. Eiermann made several statements suggesting that he considered every one of Western Reserve's customers to be his customer. For example, when asked to confirm that the non-solicitation paragraph did not make a distinction between Western Reserve's customers and previous customers of his, Mr. Eiermann testified that he "agree[d] and disagree[d]," explaining that he has "had the same customers for 25 years." In another instance, he was asked whose client MCCO was in March 2025. Mr. Eiermann responded that MCCO was his client, adding that "they're all mine[;] I had them all."

I make these observations solely to reiterate that it is clear that the maintenance of a communications log was an essential part of this contract. Plaintiffs did not trust Mr. Eiermann to abide by the non-solicitation restriction. The parties specifically and painstakingly negotiated the mechanism by which the plaintiffs could, in so many words, "trust but verify." Defendants then disregarded the language of that mechanism, ignoring its reference to "current clients" and reading in an "initial contact" limitation that does not exist with respect to the communication log. Using this overly narrow interpretation, Defendants were able to cold call prospective clients without identifying those clients to Plaintiffs and negotiate business relationships with two of Plaintiffs' customers without identifying those communications either. Ultimately, Defendants were able to obtain that business. Even if those customers approached Mr. Eiermann, as he testified, Plaintiffs were entitled under the contract to have their counsel be made aware of the ongoing communications such that counsel could have inquired into the matter further or raised an issue with the Court for resolution.

Accordingly, a preponderance of the evidence supports the conclusion that Defendants breached the settlement agreement by, at least, failing to maintain a complete communication log in and after March 2025. This was a material breach entitling the plaintiffs to file the consent judgment, as requested.

## IV. CONCLUSION

For the reasons set forth above, the Court finds in favor of Plaintiffs on the issue of whether they are entitled to have the consent judgment entered based on a breach of the settlement agreement they entered into with Defendants. Plaintiffs shall have and recover judgment against Defendants in the total amount of Sixty-Eight Thousand Dollars ($68,000) minus any payments made pursuant to the Settlement Agreement and Waiver and Release between the parties plus Ten Thousand Dollars ($10,000.00) plus interest at the statutory rate, court costs and reasonable attorney fees.

Plaintiffs may file an appropriately supported brief setting forth their reasonable attorney fees, as provided under the consent judgment, on or before **December 24, 2025**. In that brief, Plaintiffs must notify the Court of the amount Defendants have made to date pursuant to the settlement agreement.

Defendants may file an appropriately supported response, setting forth their position on the reasonableness of the sought fees and the amount they have paid to date, within two weeks of the filing of Plaintiffs' brief on fees.

Plaintiffs may file a reply brief within one week after Defendants' responsive filing.

The Court will thereafter determine whether a hearing is necessary on the amount of fees (if any) to be awarded, conduct any additional necessary proceedings, and then enter the final consent judgment.

**IT IS SO ORDERED.**

Dated:  December 10, 2025  /s *Jennifer Dowdell Armstrong*
JENNIFER DOWDELL ARMSTRONG
UNITED STATES MAGISTRATE JUDGE